Good morning, Your Honor. This is Joseph Twankowski, 3rd Ranger, and Kevin Tice. I'll try to reserve three minutes, maybe. May it please the Court, I think the place to start is with what this case does not involve. It does not involve any utterances by Mr. Moonin. It does not involve any retaliation against Mr. and Mrs. Obama. He decided to do this. I think he does not, in this case, fortunately. It does not involve any unconstitutional conduct by the Nevada Highway Patrol with the one question of this prior restraint. This case involves a district court making the extraordinary finding that a 160-word e-mail from a commanding officer to his employees could constitute. Well, there are other similar cases. We submit that there are not similar cases in which, in the law enforcement context, telling your own employees they should observe the confidentiality policy. I don't think any— This wasn't just the confidentiality policy, though. I mean, that's why we're here. I mean, this wasn't overbroad in terms of what the major was directing. So, I mean, I don't know that it's exactly what you say. I mean, in fact, I think that's where it probably should start. Sure. Because if it was just, hey, we have a confidentiality policy, and then just the official duties, and I guess that's where we are, was it too overbroad in light of the official duties and his ability as a public citizen to be able to speak out on things? Correct, Your Honor.  Which we see as confidentiality. That brings it out of the realm of standard employment. It puts nothing into the realm of driver's treatment. We sit around it. We sit around it. I don't understand. So do we have confidentiality policy in place, and it simply says that we shall treat the official and the subordination as confidential information regarding official business and shall be disseminated only to those from whom it is intended in accordance with established procedures? Why is that not enough? That seems to cover, to pull apart what you need more than that. The commanding officers who sent the email were just concerned that it wasn't being followed. So they wanted, in their view, to reiterate this. Why didn't they just reiterate the confidentiality policy? It seems like they expanded it. So our position is that this, well, why is this the same thing? So both the policy you mentioned in this email, they're both getting at the same thing. So there's no magic word with respect to confidentiality. What the email says is a preface which the district court's order omitted but which they're opening. It says, in order to ensure an appropriate flow of communication, which seems to me a very fine synonym for the concept of confidentiality. Confidentiality means information goes out. Why didn't they just repeat the confidentiality policy? Why didn't they just say that, remember, we have a confidentiality policy and we're going to diverge you to comply with it? And you don't think that the repercussions would be the same? It may happen. What is unconstitutional about phrasing it in a different way? It helps a lot of people. It really is a total gag order on people, you know, that are saying things that would be permissible. For example, this is saying that the confidentiality provision, I assume was meant to be understood to cover information, but this covers cannon, right? I mean, in other words, you can't say anything, including I don't like our canine policy, without the need to provide no information. I would submit, Your Honor, that if you wanted to draft an email that reiterates a confidentiality policy that served that interest, restricting those restrictions. But to my right, this means that you can't express an opinion about the canine policy through an employee of the department without divulging anything. No, Your Honor, I don't think that's how it could work. There could be no contact with any non-departmental for the purpose of discussing the program. The business of a good canine union is typically confidential. It says don't talk about our daily business outside of law enforcement. Including, I think, a lousy canine policy. Your Honor, I think that the way to look at this, if the inquiry is … That's the answer to that. Just say that. You can't go to the newspaper and say, I can't tell you anything, but we really have a lousy canine policy. No, I think you could say that. I didn't think I could do this. I think that any reasonable officer reading this would have understood that it is a confidentiality policy. I think the fair way to look at this is … Let me try to phrase it another way. If the test in this case was, is there something you could have said that would be constitutionally protected, but which under this particular e-mail would seem to be forbidden, no confidentiality policy would survive. If you took this e-mail and you replaced canine and blind officers with law clerks, and you replaced the canine program and interdiction program with matters pending in chambers, I think you'd have exactly what every federal judge enforces with respect, through law clerks. The Federal Judicial Center, for instance, publishes a law clerk manual. It says, do not talk about any confidential information outside of chambers. Now, could that be read to pretend? Say, a clerk can't go to the newspaper and say, I think this is a lousy case, the floor is bad, the judge is missing. No, maybe you could, and maybe that sort of whistleblown would have to be seen as some sort of implicit exception, but this is how confidentiality policies are always written. They don't say … I mean, if you wanted to read this so narrowly, yes, it could be read to say something like, you can't tell your kids where you work, you can't tell your bowling buddies that you have to work on a weekend, but confidentiality policies are always phrased in broad terms. Don't you look at this as written or in context? Because the context, as I understand it, was that there was a raging dispute, and there were … maybe people would understand it in terms of what was actually happening at the time, right? That's true. I think if you want to follow the Clark case, the Seventh Circuit, they said just look at the text. So in that case, the Seventh Circuit has found that the sheriff had retaliated, and they thought, this is the Clark case, this is the Milwaukee Sheriff's Office that the district court thought was the most significant case. The circuit has found that … they said the sheriff acted childishly. Somebody had retaliation for what they said. Another thing, in the text of this particular email directive, it talks about private citizen speech. You have the Clark email text. We submit as indistinguishable from this. But yet, nevertheless, it says, it is the policy that all sheriff's officers are keeping confidential. Don't impart it to anyone. It doesn't say anything about, you know, you can't say the sheriff is coming. You're supposed to evaluate everything that was not specifically prohibited, because I'm looking at the language, and it says, it declares things that no direct contact can be made with any unauthorized person. And then it goes on to say that any violation would be insubordination and would be dealt with appropriately. And so I guess we're back at the same, you know, question, is how do those statements not bar Mr. Moonen's speech as a citizen, and not just as an employee? I mean, I think we all understand that there are certain things as a public employee he would not be able to speak about, you know, and where the confidentiality would be appropriate regarding his duties. But here, this was a bar. And you said this is extraordinary. I mean, well, this seems to be an extraordinary statement to sit out. It seems to be, to me, I mean, having reviewed a number of these surveys, or excuse me, Mr. Gardner, I don't know how else you would phrase this. If you want it to be. Let's look at the policy in the O'Rourke case and compare it to this one. It seems to me to be night and day, actually, in the sense that that one is a keeping official business confidential, not don't say anything about anything about the policy. There's a difference between keeping things confidential and not expressing an opinion. And it says that they should not impart to anyone except for those who it's intended the official business. And no, everybody should speak on behalf of the organization. It doesn't say nobody should speak. And it doesn't say nobody should express an opinion. It just says you should keep the business confidential and you should speak on behalf of the organization. So it says exactly what you're saying wistfully that there are great disagreements, i.e., that it deals with official business and confidential information. But this one doesn't do that. I think our email superior to the Clark one is even more constitutionally sound because instead of using the phrase official agency business, which, by the way, is what the Milwaukee County Sheriff's Office happens to use, but there's no significance to constitutionally. Instead of saying that, we just went more, we said something more specific, which is the canine interdiction program. If that isn't a more specific version of official agency business, I don't know how you would phrase it. Like I say, I mean, you can find hypothetical things in which this would seem to say, well, you can't protect that. That's the helpless rule. But the way the law deals with those things is retaliation cases. I suggest that even more productively, you could talk about qualified immunity. Sure. I'd be happy to. The district court based its qualified immunity, major types of qualified immunity on the basis of a single case from out of circuit that has never been cited in this circuit, and then actually found handily for the law enforcement agency. The district court only found that this bar, this description of qualified immunity, by implication, the district court used the phrase by ambit of the implication, shows that this email, by contrast, is unconstitutional. That doesn't seem to be good enough to define qualified immunity in the 9th Circuit. Let me just quickly address. Wow. When was this policy written? This policy that was in the 90s. You mean this email? Yes. Oh, it's February 2011. I see. Okay. The Garcetti point, which is our third point, is very simple, which is to say that the district court adapted the Pickering analysis. When Garcetti changed Pickering, Garcetti says before you get to the ballot, you have to ask in what capacity he's making the speech. You may feel that he was making speech, or he would have made speech in a private capacity, but the district court did not, well, it did not decide it the way we think is wrong, or finding it by default should have taken some facts. The district court did not even consider it. That was the Targaryen restraint case, which wasn't considered. That's right. I don't think Garcetti should apply, but the district court did apply Pickering in Garcetti, so if you're going to apply Garcetti, you have to apply all the factors of Garcetti, which the district court didn't do. Mr. Jice testified, I guess, in his deposition that he never intended for the email to be used or interpreted or construed as an unconstitutional type of restraint or to limit Mr. Moonen's ability to talk about things. I'm just trying to figure out what do we do with that after the fact sort of justification at this point. I mean, can we consider that testimony? Tell me how that fits in here. I think it just supports what we've been discussing, that you have to read this in context. I think you can look at the text, but if you want to look at the larger context, it's, of course, the testimony from the officers and what they were trying to do. The Pickering analysis, again, requires you to look at what the motive of the law enforcement agency was in sending this. The district court said that's not relevant because it's a prior restraint, so the plaintiffs got their half of Pickering and we didn't get our half of Pickering. Nevertheless, we have all four community officers responsible for this email all testifying that, look, there was a series of leaks that were causing disruption, and we had a right and a duty to stop, and so we decided to send this email. That's what the purpose was. In any case, it all looks close to that. Whether or not in the prior restraint case, motive and intent is one factor. I have a fair word. No, I don't think it is, but that's the problem, which is to say that this... No, you said it was. That's why you were relying on the evidence. We do take the position that Pickering and Bersage, it doesn't make sense to apply the prior restraint, but I'm taking the district court's word on its own term that the district court applied Pickering. Well, the term prior restraint is, I think, not helpful, and one of the opinions says that because typically prior restraint law deals with judicial traits, but you have a state planning policy, let's call it that, planning policy, and someone's taking the prior restraint language out of this. Still, there are a number of cases, including in the Senate circuit, in which statements of policy of this kind have been in damages actions, and I was surprised to find out that these are subject to damages actions, but there are a number of such cases that are judged basically on their face, as I understand. So that doesn't seem to be a question. The question is whether for qualified immunity purposes there's a case close enough to this one to cut chastity notice. Right. Well, let me just make one last point about the Clark case. The Clark opinion said that the central issue, as their words said, was that on the face of this email, even though they knew that it was designed to get a constitutional protected speech, the central issue was that nothing in this email would prohibit them from going outside of it, and they think that's the same thing here. Like I say, this is how confidentiality clauses are written. They never say something like keep information confidential unless you feel very strongly that the newspaper needs to know about it. Also, that's why I used the context question. We know, and it seems to me that in this instance, people reading it would have known or would have thought that they were being told not to do what they've been doing or what they were accused of doing, which was going to newspaper and other officials and making various accusations about the way this program was operating. What's interesting here is that Mr. Boone, his allegations aren't that he tried to go to the newspaper. His allegation is that he didn't and he went. Not whether he did it, but that when he was being accused of having done it, he would understand that they were being told not to do what he was accused of having done. Yes. The only fair way, it seems, to adjudicate these sorts of issues is to let the complaining officers speak. Let's see what they say, and then let's see how the agency responds. And then we have a case, we have a witness. It's very easy to put a sentence at the end and say, we understand in some circumstances you have a constitutional right to say things the way I've tried to override that, but you didn't say that. No, no confidentiality clause he does. I mean, that's just not how they're written. They're always very broad. If he was supposed to say that's what he wanted to say, that's what he wanted to do, and that's what he did. The thing about whistleblowing is you can do it, but you better be right about it. You can say a judge is lazy and incompetent and corrupt, but unless you have good evidence for that, I don't think the Constitution is going to protect you against discipline. And they thought misinformation was going on. They thought damaging links were occurring, and they acted. And this is, I think, I don't know how you could have phrased this email better. I think it's very nice. That's great points, and I have to begin with. I think it's not talking about information as such necessarily. It's talking about their day-to-day duties, the things they do as canine and high officer. Don't talk about your day-to-day duties. But it's not saying don't give information. I mean, don't talk about it at all. Outside of authorized shields without pre-clearance. Okay. You've been very patient. Thank you for letting me address this. It's all right. Thank you. You can start. Good morning. Still morning. Ken McKenna on behalf of Madeline and the plaintiffs. I'll tell you, it is a letter, the email. That's what this case is. It is a letter, an email form. That is this case. It is the Four Corners. It does speak for itself. It is what it is. And all the appellate has tried to do throughout this case, both at the district court level, motion, motion, re-motion, argument, briefing here and arguing here today, is say the letter says something other than what it says. Well, you say the motive and the intent and the underlying dynamics are relevant considerations. At the moment, the case law really supports that proposition. I do not object. The case law supports the opposite. You take the letter on its face, so the content as to what the reader would have gotten having received this letter, not what the misstated intent was, or the after the fact. There could be cases where that applies, but the over-broad nature of this communication, and let me just say, I mean, you can look at the. I'm just curious about this case. It gives me a little bit of sympathy for his argument that we ought to wait until somebody says something. Is that this is now, this is not a prospective case anymore. Maybe it was when filed, right? As to this question, it's only a damage exception, is that right? At this point, correct. Right. Has anybody asked what the possible damages are? There have been discussions about what the damages should be or could be, and there's been communication back and forth in that regard, but there has not been a settlement. It seems to me that without any adverse action taken, the damages are nominal, $1 damages or something. I would totally disagree with that, and I think the other side, based on their prior, the mediations that have occurred in this case. There are damages. I guess I'm just trying to figure out, how can we be sure that would have been his speech? I'm just trying to figure out if there's any case law out there that permits us to consider what he alleges his speech would have been. I follow, but I'm not sure that's necessary to inquire as to what his speech would have been. He's being told, and we know the employee, citizen, public need to know, and public importance is the issue in the initial analysis, before you even get to the paper analysis on the balance. Is this something? Is he being told, as you stated, Your Honor, that he can't even have an opinion about conduct that's occurring, and if that highway patrol, police officers, law enforcement officers who are conducting unconstitutional searches, breaking the law, and doing other conduct, which obviously the public has to know, needs to know, and has a right to know, and that he's aware of this information, and is being told, because it is in context of what's going on, over five news stories about this K-9 program and illegal activities. It's on videotape, that officers are ripping open, poking holes in packages at the UPS Depot, so the dogs can smell better when the package comes by, so they can get a positive hit. It's on videotape, and it was on the news. So we know what it is that he's going to report as his opinion. It all deals with his official duties and his job. Not, I mean, the illegal conduct is certainly not part of his official duties. It's the opposite of his official duties. At that point, he is getting information that the public sent us. Excuse me. But it's couched, though, in the email, I guess, or maybe in the brief that, you know, if there's any violation of any, you know, thing, rule, that's part of their official duties to report to their supervisor. So, you know, your counsel here across the aisle is saying, oh, this is why he's saying it's better. This statement was better than some of the other statements because they were trying to limit it to his official duties in the way they styled it. And so I'm just curious, why is it that some potential speech lying with his official duties and given that this is still at the summary judgment phase, is this something that would go to the jury to determine whether or not, you know, this is part of his official duties because there does appear to be some overlap? Do you want me to answer your question with a question? Read the email. I've read the email. I know. You're asking me the question. I have read the email. I understand. No. That's why I'm asking the question. No in capitalists. It's capitalists. No direct contact. Any communication in capitalists. Any non-departmental people in capitalists. All communication that's restricted. The same thing with supervisors. They're not saying you can't do anything whatsoever. They're saying, well, if the supervisor's concerned, you're probably sorry. You can blame somebody. Well, that's what they want you to interpret. But it doesn't say time to your city. It says time to your city. It's in addition to saying all. No. You will be punished. I mean, you're threatened with insubordination. That's termination. Mr. McGarrett. Yes. Does that overlap with official duties? It does not overlap. Is it not what they're talking about? It's overprop. It's beyond his official duties. So my question is, you don't think that part of overlapping is to deal with his official duties? He has official duties as an officer and a canine, or et cetera, et cetera, confidentiality of information within. That's not what we're talking about. That's what they want to talk about. And they could have done that, but they didn't. They said you can't communicate with anybody about anything. And that includes a canine. The problem is that even with regard to a more restrained confidentiality policy, such as the other one here or such as the one in the Milwaukee case, there are instances, I presume, in which a public employee might be constitutionally privileged to violate it, right? I'm not sure if I caught the end of that. Michael? Constitutionally privileged to violate it. In other words, if you have a policy that says you cannot impart any information, that you learn in your official capacity about the business of this agency, and it's leveraged information, it's leveraged to official communications, it still could be that if you learn in your official capacity that your boss is taking bribes, you could violate the policy, but you still have a constitutional right to do it. Correct. I guess that's why I was a little concerned about the official capacity element in relation to public duty, because they could be at the same time. But that privilege would not invalidate the policy, would it? No, of course not. Even though if I violate it, I'd be protected. Yes. And I understand that that's really the argument on the other side of this. What they're saying is, look, you know, you have to have the courage to share convictions. If you believe that there is something that violates this policy, that you have a constitutional right to say, go ahead and say it. It's that proposition. Now, what's wrong with that as an approach to a sensible world, which, yes, there is a confidentiality value with regard to many law enforcement and other professional organizations and the same, and certainly there's the possibility of a contractual agreement that you're not going to say anything that goes on here. And the fact is that there may be constitutionally based exemptions to that. Yes. The policy on its face is not valid. Well, it's not a policy. The policy is the confidentiality policy that they all live under. This is not what this is. This is a letter saying we're going way beyond the confidentiality policy. You can't say anything to anybody under no circumstances about anything way beyond the confidentiality policy, way beyond the employee situation as a public citizen with a public right and a public's need to know about improper illegal conduct going on within the place that you work, even though you're a law enforcer. You can't say anything about it. Well, it says that in one sentence, but in the prior sentence it says don't do it. It doesn't say come and get approval to do it. It says no communication, no direct contact, any policy, all communication, and it says present it to somebody or ask permission. And my understanding of what it says is present it for approval, and if it's approved, then communication will be accomplished by the appropriate manager or commander if deemed appropriate. In other words, not that you can say it, but they will say it if they think it's appropriate. We can still tell you not to say it. For instance, you have an opinion. So let me ask the question. If you had an opinion, you're this officer, and you have an opinion. I understand it's a friendly question, and I know I'm going to run out of time, but, you know, we're all talking the same thing. We're kind of going around a little bit. But yes, if an officer is aware of some illegal conduct, if he were to take it to a supervisor and say, I think this is a public concern, I want to make a general statement outside the agency that there's an illegal activity occurring, and the supervisor would say, oh, no, don't do that, and then he does it anyway. So would he be protected in the Constitution? Of course, it's basic stuff. Should we take a break? Okay. Okay, stay seated. Yes. Go ahead. You didn't miss anything, or I was just getting tests. I just thought it was kind of what you'd see already. I think the thing that, obviously, we've been dealing with this case over the years, and the judge has his ruling, and I appreciate and understand it. I think the thing that concerned me the most this morning was what Counsel said. He considered this a garden variety letter, that this would be just garden variety. You can't talk to anybody any time. I guess that concerns me more than even the incident in this specific case that the state of Nevada, the representatives for the Highway Patrol, thinks that you can tell people you can't talk to anybody about anything at any time because we're the Highway Patrol, and we will terminate you if you do, and your opinion or your constitutional rights are invalid, and they don't count because your employment is more restrictive than your right as a public citizen to speak out about injustice or wrongdoing. I'm a little shocked by that statement. One of the health advantages in a dental cell area is that employees have information they obtain because of their status as employees. And, moreover, there is a managerial authority because of their status as employees, on the one hand. On the other hand, there's a strong public interest. In a way, it's a misportrayal to say they're speaking as citizens. They're speaking as citizens because of things they learned as employees. That's what makes their speech valuable and different. Now, in some instances, it might be otherwise. They may just be speaking directly as citizens about things that have nothing to do with their employment. I think that was where the original cases came from, like Pickering and so on. But, as time has gone on, it's really been more like whistleblowers. And so, the adjustment is quite close. And that is truly qualified to be a good question. I.e., at what point, I mean, given the fact that there is a fair amount of room for employer control here, but at some point there isn't, was there sufficient notice here? And I think that is so well taken, because when we consider our society, and we certainly consider law enforcement uniquely, it is such a closed system. And how else would the public get information about the internal? I quit, because you're out of time. I still like to hear you tell me what cases, but Mr. Tice, I noticed that this was an unconstitutional right. I think that Judge Hicks covers that in detail, and he goes to just, again, the four corners of the email itself, and it's over-broadness. And then he makes the statement that any reasonable law enforcement supervisor would know that this is over-broad and beyond confidentiality, beyond the employer-employee restrictions that you could expect. And, again, I would, it just, it struck me every time I looked at this email, and I put yellow highlights on it, there's a thing now in Twitter and texting, if you use capital letters, you're yelling. If you text somebody and you use capital letters, you're yelling. So he's yelling the word, no. He's yelling the word, any communication. He's yelling the word, any non-departmental people. He's yelling that you will be punished. I mean, this is extreme. Go back to my question. Sure. If the problem is that now this Supreme Court is taking an increasingly rigorous view of qualified immunity in terms of what case would have given you this balance, the judge, Judge Hicks, doesn't really cite any case, does he? Why? I think he takes the cases, the Garcetti and the Pinkring case, and I think he discusses it in quite a bit of detail. And he seems to focus on those key words, again, and they happen to be the words that are capitalized. Any, all, any non-departmental will be punished in subordination. Again, these are, this is an extreme email. And to say it's garden variety, as it says, is probably the most concerning thing I've heard today. If this is normal, and this kind of communication can go out to employees, if they can't talk to anybody about anything at any time, then we have no first amendment right. You have Pinkering balancing. Yes. It has to be engaged and correct. Correct. And I'm just curious as to how that really plays out in the context of qualified immunity. Because Pinkering balancing deals with, of course, the government interest, way against all these other things. Does that sort of suggest that qualified immunity should be looked at very carefully when we deal with the Pinkering balancing case? And do you have any Pinkering balancing case which says that there is no qualified immunity when we deal with the prior restraint case and we have to deal with Pinkering balancing? I would actually flip that the other way. Justify what you did with qualified immunity. Don't make my client say it's not qualified immunity. How does he say he has qualified immunity when he writes an email that is so overbroad, so in violation of the first amendment, so in contrast to the public's need to know, so the opposite of someone being able to exercise their opinions and their rights under the first amendment. How does he say, I didn't know that violated someone's interpretive training dealing with a drug-related type of humanitarian matter. That is just not in any law work. I guess it is in the interest of my two wonderful law folks to go through and give you your argument. Just to hear my argument, Your Honor, now I'm very excited to have been here. But, you know, I'm just curious about that. Unless you took a bribe and they were a witness to it. Okay, that's what we're talking about. That's the difference. It's not employment. It's not confidentiality. It's not talking about somebody's personal habits. We're talking about the illegal conduct by law enforcement. This is very much a public interest issue. I'm sure you can suggest that. I'm sure they can respect that. However, I don't know if they get it. That you would have a right to say they don't have a constitutional right to do what they have a right to do under the first amendment, which is express their opinions. And, again, we're beyond opinions. Those are good guys. We're talking illegal activity.  We're talking about personal habits at the office. We're talking about police officers committing illegal activity. And this letter trying to suppress an officer from bringing that to the public's attention. Thank you for allowing me. Thank you, Your Honor. I appreciate the indulgence. I really do. Quick point. This talk about unconstitutional activity. This is an allegation in their complaint that they never proved. After years of discovery, it's unconstitutional conduct. He said it, but it's not true. The point about the whistleblowing. The point about opinion. Can you say the same? I think that a court, just like a law enforcement agency, has the power to restrain speech that calls the court or the agency into disrepute. You can go around and say, officers committing unconstitutional conduct have the right to do it. It's not true. They can act on it. The Supreme Court has said that in the San Diego versus Roe case. You don't have a right to badmouth an agency if you can't prove it. Same thing with your law clerks. Now, if your law clerks say, well, my judge has never read a single brief in his or her life, if that's not true, then you don't have a First Amendment right to say those things. You have a First Amendment right to slander, to spread mistruths. I mean, that just colors the discussion. The question is not whether you have the right to spread mistruths. The question is whether you have the right to spread truths. I would say yes. I would say I would concede that you have a First Amendment right to expose unconstitutional conduct by a law enforcement agency. In this case, he alleged it, but he never proved it. It was just unfounded allegations. Excuse me. I didn't hear your question. The fact that we're having this rigorous discussion does that not suggest that qualified immunity should attach to this particular case? I think it suggests that qualified immunity should not attach to this case. I mean, if qualified immunity means that you should attach to it, I'm sorry, yes, you should attach to it. Yes. Thank you. My answer is yes. The whole point of qualified immunity, obviously, is every officer has to do this. If every officer does this, do you think there would be, in these hundreds and hundreds of cases in which a law enforcement officer complains about something his or her department did to him or there's never been a case saying that something like this constitutes a presumptively unconstitutional prior state, yes, I think there's an absence of authority for stripping him of qualified immunity. The problem, of course, is that the next time somebody writes a policy, it's going to be a slip-in, and even assuming that we first held this one unconstitutional, which is just an assumption, and then after the qualified immunity point and said you have qualified immunity, then the next time they write a policy it'll be reported differently and everybody's going to always get qualified immunity. Julian. Our concern with jumping to the qualified immunity thing is that it just chips away at the legitimate powers of law enforcement agencies to regulate the flow of information. I think you'd rather run on the merits. I would rather run on the merits, Hunter, and I just would ask just to consider, just because of my last point, if you have in your mind an experience where the guy is blub-whistle-blowing about an actual unconstitutional conduct, that's a classic case where he would be protected, but that was an allegation, it was a complete allegation in this case. You do not have a First Amendment right to go say whatever you want about a law enforcement agency. It brings it into disrepute. I know we don't like to talk about these things as sort of a valid interest, but this Court in Dibble v. Chandler, Supreme Court in San Diego v. Rome has said that a law enforcement agency has a valid interest in ensuring that the public understands fairly what it is they do and what it is they don't do, because it's very hard to have a law enforcement agency when the public doesn't trust it. The Supreme Court said that mistruths about a law enforcement agency impair their mission. Right. And this is, and maybe I'm misusing it, but the tension here is you're assuming mistruths, and he's assuming truths, and if, for example, you have a law enforcement agency that is going around conducting non-constitutional searches, and a person who knows about that comes forward, that person would please with the public interest. That's the problem. They made an allegation. Certainly it's significant that he alleged this massive sweep of unconstitutional comment from searches and misuse of money. No, I'm saying that inconceivably there's a tension between the interest in keeping, an appearance of keeping respect of the community and the question of whether you're entitled to respect of the community. Yes, Your Honor. There's a tension, so. Thank you. There's been a comment made that he's not been able to resist submitting a written comment.
judges: Berzon, Murguia, Block